## HARRIS v. BRATTON.

### DeLOACH v. SAME.

### WILLIAMS v. SAME.

1. TRUSTS IN PERSONALTY—EVIDENCE.—A trust in personal property may be created without writing and proved by parol testimony, but it devolves upon the party claiming it to show by clear and unequivocal evidence an explicit declaration of the trust, as well as its nature and terms. Mere loose and indefinite expressions are insufficient.

2. EXPRESS TRUSTS—PAROL EVIDENCE—LAPSE OF TIME.—Lapse of time will not bar an express trust which has been established, but should be considered in determining the question whether a trust exists. Where the *cestui que trust* has made no claim to any trust for over twenty years after its alleged creation, and not until the grantor and trustee are both dead, and fails to show clearly the trust, or to prove any admissions by the trustee, no trust can be decreed to have been established.

Before WALLACE, J., York, July, 1890.

These three cases were heard together on testimony taken in open court in the hearing of the Circuit Judge. The opinion states the case.

*Messrs. C. E. Spencer, W. B. Wilson, sr.,* and *G. W. S. Hart,* for appellants.

*Messrs. W. B. McCaw, J. E. McDonald,* and *L. W. Perrin,* contra.

July 28, 1891. The opinion of the court was delivered by

MR. JUSTICE McIVER. These three cases, involving substantially the same facts and same legal principles, were heard and will be considered together. The plaintiffs claim that as far back as 1867, the intestate, John S. Bratton, sr., was constituted their trustee of certain personal property, to wit, money, by their mother, Mrs. Harriet Bratton, for which he never accounted, and and now, being dead, the object of these actions is to obtain from

his administratrix, as well as from his heirs at law and distributees amongst whom his estate has been distributed, an account of their several alleged trust funds, as well as judgment for the amounts found due upon such accounting. The defendants set up several defences: 1st. A denial that any trust had ever been created. 2nd. That such alleged trust, if ever created, has been discharged by settlement which should be presumed from lapse of time. 3rd. The statute of limitations. 4th. Actual payment. 5th. That before any notice of plaintiff's claim came to the defendants, the estate of said John S. Bratton, sr., had been fully settled, and the several parties interested had gone into the exclusive possession of their respective shares.

The Circuit Judge, without passing upon the fourth and fifth defences, overruled all the others and rendered judgment that plaintiffs had established the alleged trusts, and that the defendant, Harriet J. Bratton, as administratrix of the personal estate of said John S. Bratton, sr., should account for the several trust funds, as well as for her administration of the estate of her intestate, and that she, with the other heirs and distributees of said John S. Bratton, sr., should account for the assets to them descended. From this judgment the defendants appeal upon the several grounds set out in the record, which it is unnecessary to repeat here, as we think the whole case turns upon the question made by the first defence above stated.

For a proper understanding of this question, a brief outline of the facts will be necessary. It appears that old Mrs. Bratton, the mother of these plaintiffs, as well as of the legal trustee, John S. Bratton, sr., had, through her said son, who had for several years been acting as her agent in the management of her property, sold a large quantity of cotton, whereby she became possessed of quite a large sum of money, a very considerable portion of which she determined to divide amongst her eleven children and two grandchildren. This division was made at her house, in the parlor, some time in the year 1867 (when precisely is not stated, though it is probable that it was prior to the 17th of November of that year), three of the sons and a son-in-law being in the room where the money was divided. The share of each was $892, and each of the sons present received their respective shares, but the

plaintiffs, not being in the room at the time, their shares were counted out, and each package labelled with their names. John S. Bratton, sr., then gathered up the packages of money which had not been delivered to the respective children, and carried them into the bed-chamber of his mother, when, according to the testimony of the plaintiff, Jane Williams, who was then living with her mother, and who was the only witness as to what then occurred, the following took place:

Q. Just state what happened in your presence between your mother and your brother John on that occasion? A. Brother John handed me the money, and said it was our trust money, and mother told me not to take it; that she was not satisfied to keep the money in the house, and she wished him to take it and invest it for our benefit. Q. For the benefit of those four girls? A. Yes, sir. Q. Did John take the money? (Defendants' counsel object as to the case of this plaintiff under section 400 of the Code. The Court: Any conversation between Mrs. Harriet Bratton and John Bratton she can testify to.) Q. Did your mother tell him anything about paying the girls interest? A. Yes, sir. She said she didn't want us to use the principal, but to use the interest. Q. And your brother, in your presence, did take those four shares? A. Yes. sir.

This witness, on her cross-examination, having stated that her mother had insured her life, was asked whether the premiums on the life-policy were to be paid by her mother out of her own money, or out of this package set apart for her on the division above referred to, testified as follows: "She insured our lives, and, of course, she was to pay the money. Q. You can't say whether or not it was to be taken out of this $892? A. No, sir; it was not to be taken out of that. Q. How do you know it was not to be taken out of that? A. Because mother told brother John to invest that money for the benefit of our children, and she insured our lives." Again, when this witness was examined in reply, she was asked by the Court as to what occurred in the bed-chamber of her mother, when her brother John brought the packages of money into that room, and, after stating that there were three packages, one for witness, one for Mrs. Harris, and one for Mrs. DeLoach, with their names endorsed on the slip of paper in which

the packages of money were wrapped, she was asked: "Q. Was that money given to your mother? A. No, sir; that was the time mother said she didn't want them to have it; she wanted him to keep it for them. Q. Did he say anything? A. He said he would take it and do the best he could with it."

It also appears that John S. Bratton, sr., became an exile from the State on account of the Kuklux prosecutions some time in the year 1871, and did not return to this State until some time in the year 1873, where he continued to reside up to the time of his death, 21st January, 1888. His mother died in 1874, and these actions were commenced 21st February, 1890. There was also some testimony which is relied upon as tending to show a recognition of the trust alleged by John S. Bratton, sr., which will be more particularly stated in the progress of the discussion, and need not therefore be specifically set forth here.

It is very obvious that the fundamental question presented by this appeal is whether any express trust ever was created; for until that is determined, the other question cannot arise.

1   While there is no doubt that a trust in personal property may be proved, as well as created, by parol evidence, there is as little doubt that the evidence relied upon for that purpose must amount to a clear and explicit declaration of trust. As is said in Hill on Trustees, 59: "In order to fasten a trust on property of any kind by means of parol declarations, the expressions used must amount to a clear and explicit declaration of trust. They must also point out with certainty the subject matter of the trust and the person who is to take the beneficial interest. Loose and indefinite expressions, and such as indicate only an incomplete and executory intention, are insufficient for this purpose." And as is said in 2 Pom. Eq. Jur., sec. 1008, "the consensus of authorities demands clear and unequivocal evidence." The reason of this well settled rule is obvious; for while the terms and objects of a trust declared and established by some writing can and must be ascertained from the language used in the writing, yet where a trust is raised by parol evidence, it is absolutely essential that such evidence should be clear and explicit, for otherwise a court would not be able to enforce the trust, the terms and

objects of which were left by the evidence in confusion or uncertainty.

In the light of these well settled principles, let us examine the question whether the evidence adduced was sufficient to show that any express trust had ever been created in favor of these plaintiffs. The only testimony which we have been able to discover in regard to the creation of the alleged trust, comes from a party interested, who is testifying as to a conversation which she heard about twenty-three years before she was examined, and we find that she gives three different versions of this conversation. In her first examination in chief, when asked to state what occurred when it is claimed that this trust was originally created, she said: "Brother handed me the money, *and said it was our trust money*, and mother told me not to take it, that *she was not satisfied to keep the money in the house*, and she wished him to take it and invest it for our benefit." Now, it is perfectly certain that the witness is mistaken in saying that her brother said it was our trust money; for it cannot be pretended that up to that time any trust had been created or even thought of, certainly none had been mentioned. Now, if she had said simply that her brother when he came into the bed-chamber handed her the trust money, it might possibly be argued that she characterized it as trust money, because she so regarded it from what *afterwards* occurred ; but how she could have said that her brother, who, so far as the evidence discloses, had never received the slightest intimation up to that time that there was any intention to impress it with any trust, "said it was our trust money," it is absolutely impossible to conceive. But in addition to this, the language of the mother italicized above, that she was not satisfied to keep the money in the house, shows anything else but an intention to constitute John S. Bratton, sr., a trustee of the money, and, on the contrary, rather tends to show that the old lady's idea was to keep the money herself for the benefit of her daughters, but not deeming it safe to keep that amount in her house, requested her son, as her agent, to invest the money for the benefit of her daughters.

Then take her statement on the cross-examination as to what occurred, where she gives as a reason why her mother did not intend to pay the premiums on the life insurance out of this

alleged trust money, the fact that her mother told her brother John "to invest that money *for the benefit of our children.*" This, it is claimed in the argument, was a mere *lapsus linguæ* on the part of this good lady ; but while there might possibly be some ground for such a claim if the witness had simply stated that her mother told her brother to invest the money "*for the benefit of our children,*" whereas she really meant to say for tne benefit of her mother's children, we do not see how it is possible to suppose that it was a mere "slip of the tongue," when the statement was made *as a reason why the fund could not be used in paying premiums on the life policy ;* for if the investment was to be made for the benefit of the children of the witness, then, of course, it could not be used for any other purpose ; but if for her own benefit, then it could be. But when this witness is recalled in the reply, she, for the first time, speaks of this transaction between her mother and brother John in a way that might possibly tend to show that there was an intention to create some kind of a trust, but what was its nature or terms is still left in obscurity ; for all that she says then is that her mother, speaking to her son in regard to the three packages of money intended for these plaintiffs, said, "she didn't want them to have it ; she wanted him to keep it for them," to which he replied, "he would take it and do the best he could with it."

It may be contended, however, that the testimony of Mrs. Williams, relied upon to establish the creation of the trust, is confirmed by certain alleged admissions of John S. Bratton, sr., as derived from his letter to his mother, written during his exile from "Dark Corner," bearing no date, and set out in the "Case" as exhibit D of the testimony, as well as from certain alleged declarations made by his wife, as to what he had said to her. These statements attributed to the wife, which, however, she denies, were plainly incompetent as mere hearsay, even taking the testimony on the part of the plaintiff as true, and rejecting altogether the testimony of the wife. They certainly do not fix upon John S. Bratton, sr., any admission of the trust by any competent testimony. And as to the letter to his mother, so far from its affording any evidence that he admitted the trust, it rather tends to show what we are inclined to think was the true character of the

relation of John S. Bratton, sr., to this money which his mother intended to give these plaintiffs, viz , that of agent of his mother. For there is nothing in the letter which even indicates that he regarded himself as trustee for his sisters.    The word "trust" or "trustee" is not found in it; but, on the contrary, he seems to speak of himself only as the agent of his mother, and bound only to account to her as such.    He says : "When I left home, it was so sudden and unexpected to me that I had no time to make preparations or even bid you farewell.    I left my business matters all in black and white (which can be readily comprehended) and filed them in safety, which I did not desire to be handled until I returned.    You have requested of Harriet [his wife] your notes and land papers, also your will made and written at your request and approved by you.    I have informed her where she could find them and return them to you.    I knew that there must be some dissatisfaction about the will, and when it is returned to you I hope that you will read it over to all the family, and see if it was made for my benefit.    Your eight hundred dollars in gold left in my possession, I was necessarily forced to use four hundred dollars of it when I left home, as I could not get it from the store. You recollect that I informed you more than once that I paid Jane and Aggie's [plaintiffs Mrs. Williams and Mrs. Harris] insurance premiums, and you requested me to pay myself out of your gold, and at your request I used four hundred dollars, which did not pay me the amount I paid out for them.    I can show what has been paid in black and white, and will show their accounts to your satisfaction when I return home."    And then he goes on to speak of the disposition to be made of certain notes of his mother's.

It seems that so far from there being anything whatever in this letter which in the remotest degree recognizes any liability to any of his sisters, or that he held any funds of theirs in his hands, its whole tenor shows that he was only referring to his business relations with his mother, of whom he had for a long time been the agent, and his only anxiety was to satisfy her that his dealings with her were correct, and that he would be able to show that fact to *her* satisfaction.    His only allusion to his sisters, two of the plaintiffs, is in reference to the payment of the

premiums upon their life policies, which it is not claimed were to be paid out of this alleged trust fund, but were to be paid by the mother; and it is in this connection he says: "I can show what has been paid in black and white and will show their accounts to *your* satisfaction when I return home"—not to the satisfaction of his sisters, as he would have said if he had been alluding to their so called trust funds, but to the satisfaction of his mother, who would have had nothing to do with any trust fund that might have been created, but did have something to do with the use of her money—her gold—used in the payment of the insurance premiums. It seems to us, therefore, that even considering the case upon the testimony as adduced by the plaintiffs only, it is altogether insufficient to establish the creation of any trust by that "clear and unequivocal evidence" which the rule of law above stated requires, and that the Circuit Judge erred in holding otherwise. In cases like this the burden of proof to establish the trust is upon the plaintiff, and where the plaintiff fails to furnish such evidence as the rule of law requires, he cannot recover.

This conclusion, which has been reached from a consideration of the testimony on the part of the plaintiffs alone is confirmed and strengthened by the facts and circumstances brought out in the defence. In the first place, the lapse of time between the alleged origin of this trust and any attempt to enforce it—about twenty-three years—is a circumstance entitled to great consideration; for while it is true that mere lapse of time will not bar an express trust, after it has once been established, yet it is entitled to great weight in considering the parol evidence relied on to establish the trust. As is said in 2 Story Eq. Jur., § 1520*a*: "It is often suggested that lapse of time constitutes no bar in cases of trust. But this proposition must be received with its appropriate qualifications. As long as the relation of trustee and *cestui que trust* is acknowleged to exist between the parties, and the trust is continued, lapse of time can constitute no bar to an account or other proper relief for the *cestui que trust*. But where this relation is no longer admitted to exist, or time or long acquiescence have obscured the nature and character of the trust, or the acts of the parties, or other circumstances give rise to presumptions unfavorable to its continuance; in all

such cases a Court of Equity will refuse relief upon the ground
of lapse of time and its inability to do complete justice. This
doctrine will apply even to cases of express trust, and *a fortiori*
it will apply with increased strength to cases of implied or con-
structive trusts." See also the remarks of Lord Cottenham in
*Attorney General* v. *Fishmongers' Company* (5 Mylne & Cr.,
16), where, amongst other things, he said: "If there be no doubt
as to the origin and existence of a trust, the principles of justice
and the interests of mankind require that the lapse of time should
not enable those who are mere trustees, to appropriate to them-
selves that which is the property of others; but in questions of
doubt whether any trust exists, and whether those in possession
are not entitled to the property for their own benefit, the princi-
ples of justice and the interests of mankind require that the ut-
most regard should be paid to the length of time during which
there has been enjoyment inconsistent with the existence of the
supposed trust." And, without encumbering this opinion with
further quotations, see *Prevost* v. *Gratz*, 6 Wheat., 481; *Badger*
v. *Badger*, 2 Wall., 87.

Now, in this case there is not only great lapse of time, but we
fail to find any evidence of any admission or acknowledgment
by the alleged trustee of the trust now claimed to be established
by mere parol evidence of a single interested witness of a conver-
sation which she heard about twenty-three years previously,
which she narrates in three different forms, leaving not only the
nature and character of the alleged trust in obscurity, but, to say
the least of it, leaving it doubtful whether any trust was in fact
created. On the contrary, the evidence shows that the alleged
trustee lived for about eleven years after his return from exile,
and yet during all that time no claim or demand was ever made
upon him by either of these plaintiffs even for the interest of the
alleged trust fund, although the evidence also shows that during
that time at least two of the plaintiffs were in needy circum-
stances and one of them made repeated demands upon the alleged
trustee by letter for pecuniary assistance, which letters contain
no intimation whatever of the trust now sought to be set up after
the death of old Mrs. Bratton, who, it is claimed, created the
trust, and after the death of the alleged trustee, who died leav-

ing quite a handsome estate, which was divided amongst his heirs at law before these actions were instituted.

It seems to us that, in view of these circumstances, it would be extremely unsafe to allow a parol trust to be established by parol evidence of "loose and indefinite expressions" which a witness claims to have heard in a conversation between parties, both of whom are now dead, about twenty-three years before such evidence was taken, especially when her statement as to such conversation contains a mistake palpable on its face, and varies in its terms on each occasion when she is asked to state what occurred. For without intending to impute the slightest intentional wrong to the witness, the frailty of human memory is such as to render it unsafe, after such a lapse of time, for a court to base a decree upon such evidence, where it is not only not corroborated by the other circumstances, but, in our judgment, is altogether inconsistent with them.

Having reached the conclusion that the plaintiffs have failed to establish the alleged trust, upon which these actions are founded, the other questions presented cannot arise and need not therefore be considered.

The judgment of this court is, that the judgment of the Circuit Court, in each of the cases above stated, be reversed, and that the complaints in said cases be dismissed.